Hartford Accident & Indemnity Company *v.* Bradley.

4-8225 204 S. W. 2d 792

Opinion delivered October 6, 1947.

Rehearing denied November 3, 1947.

*Sherrill, Cockrill & Wills,* for appellant.

*Joe D. Shepherd,* for appellee.

SMITH, J. The decree from which is this appeal rendered judgment against the Bank of Dover in favor of twelve sureties, upon the bond of J. T. Murphy, as treasurer, and it is now stipulated that the bank has paid these judgments and its appeal from those judgments is dismissed. There remains, however, the appeal of the Hartford Accident & Indemnity Company, hereinafter referred to as Hartford, from the judgment rendered against it in favor of the bank for $2,199.99.

This judgment was the result of litigation, the history of which is as follows: J. T. Murphy was the county treasurer of Pope county, and gave bond as such with the National Surety Corporation of New York, as surety. Reece Caudle and E. C. Bradley and other citizens of Pope county executed an indemnifying bond to the surety company as a condition precedent to that company executing the qualifying official bond of Murphy, who carried his accounts as treasurer with the Bank of Dover and with the Bank of Russellville and the Exchange Bank of Russellville. These banks had all been approved as county depositories for the public funds of that county.

Murphy carried three accounts with the Bank of Dover. One was his personal account, another was his County General Funds account, and the third, his School Fund account.

The master appointed in the decree from which is this appeal, found and reported that Murphy's official accounts with the Bank of Dover were to be inactive, and that his active accounts as treasurer should be and were

with the two banks in Russellville, on which banks checks were drawn in disbursing the public funds of his county. It was reported and found by the master that Murphy operated under an agreement whereby he was to keep a deposit of School Funds with the Bank of Dover in the sum of $3,500. The finding of the master that these official accounts with the Bank of Dover were intended to be inactive is sharply questioned, but we think the testimony supports that finding. A circumstance tending strongly to support the finding is that Murphy's School account remained constant. The representative of the State Auditorial Department who examined Murphy's account testified that the cashier of the Bank of Dover told him those accounts were inactive. He further testified that Murphy's School account remained constant at $3,500 and that the bank furnished him with statements of deposits to Murphy's credit on December 31, 1937, of $5,000 and again certified the balance to the credit of that account as of December 31, 1938, was $5,000. This auditor further testified that Murphy's active accounts as treasurer were kept at the two banks in Russellville.

An audit of Murphy's accounts was made by the same auditor on April 29, 1939, at which time the balance to the credit of the School Fund remained at $3,500, whereas, there was a balance to the credit of the County General Fund in the sum of $696.50 only, and the auditor concluded that Murphy was short to the extent of $4,303.50. This auditor further testified that J. L. Lemley, who was the cashier of the Bank of Dover, admitted that personal checks of Murphy had been paid out of this account.

A full audit of Murphy's accounts made by the chief county accountant of the State Auditorial Department showed that Murphy was short in his accounts in the sum of $3,995.54, for and during the year 1938, and in the sum of $2,126.03 for his term of office beginning January 1, 1939, to the date of his resignation. Murphy committed suicide and Lemley resigned as cashier of the Bank of Dover.

The personal sureties on Murphy's official bond recognized and admitted their liability, and they proceeded to liquidate it in part in the following manner: One Fay Price, a resident of Dover, was a depositor and stockholder in the Bank of Dover, and an arrangement was made whereby the Governor would be asked to appoint Price to succeed Murphy as treasurer for a small monthly salary to be paid Price, and that Price would apply the commissions and fees paid him as treasurer to the payment of Murphy's shortage. It was further arranged that Price, as trustee, should borrow from the Exchange Bank of Russellville the sum of $6,121.57 and should execute his note, as trustee, to the bank for that sum. To indemnify Price the sureties on Murphy's official bond executed their joint note to Price as trustee, for the sum borrowed from the Exchange Bank, and this note was deposited with the Exchange Bank as collateral security for Price's note to the Exchange Bank.

Three thousand nine hundred ninety-five dollars and fifty-four cents of the proceeds of this note were paid to Caudle, who in turn paid the money to Price, as treasurer, in settlement of Murphy's shortage for that amount in his 1937 and 1938 accounts. Pursuant to an order of the county court, Price executed a receipt to Caudle in settlement of Murphy's 1937 and 1938 shortage, and the court order recited that Caudle, who was acting for himself and the other makers of the note to Price, who were all sureties on Murphy's official bond, should be discharged from further liability to the county for those years.

From the proceeds of his note to the Exchange Bank of Russellville, Price paid the sum of $2,126.03 to E. C. Bradley, one of the makers of the collateral note and a surety on Murphy's official bond. Bradley, under the order of the county court, paid this sum to Price as treasurer, in satisfaction of Murphy's shortage, for his unexpired term.

Upon receipt of these payments the county court ordered Price, as treasurer, to execute his official receipt satisfying the claim of the county against the sureties on

Murphy's bond as treasurer, and further ordered that Caudle and Bradley and the other sureties be subrogated to the rights of the county. In making these payments Caudle and Bradley acted for themselves and the other sureties on Murphy's bond on the faith of whose credit the money had been raised, for the purpose to which it was applied.

Separate suits were brought by Caudle and Bradley against L. J. Lemley, the cashier of the Bank of Dover during all the time the transactions leading to Murphy's shortage occurred, and also against the Bank of Dover, and against the Hartford Accident & Indemnity Company. It is conceded that Hartford had executed to the Bank of Dover on July 27, 1936, a fidelity bond covering Lemley's conduct of the bank and that this bond formed a continuous contract, continuing until its termination in a manner set out therein, and was in full force and effect during all the happenings herein set out. It was alleged that Lemley, as cashier of the Bank of Dover, had connived and cooperated with Murphy, as treasurer, in converting various sums of money on deposit with the Bank of Dover from Murphy's credit as treasurer, to the personal account and benefit of Murphy, and that Hartford was liable under its bond for these conversions.

The official audit of Murphy's accounts developed that most of Murphy's shortage originated in what the auditor and the master found were Murphy's inactive accounts with the Bank of Dover, as treasurer, and that Lemley, as cashier, had permitted Murphy, as treasurer, to draw checks upon the inactive accounts by the use of counter checks, rather than official checks, and to deposit the proceeds to his personal account. It was shown that Lemley, as cashier, had falsely certified the balances in the treasurer's accounts to the State Auditorial Department, and had permitted Murphy, as treasurer, to indorse vouchers payable to Pope county, and to deposit them to Murphy's personal account and to check out the proceeds thereof, on his personal check for his personal use.

When these practices, and the shortage resulting from them, were discovered the president of the Bank of Dover wrote Hartford a letter reading as follows:

"BANK OF DOVER

"Dover, Arkansas, May 10, 1939.

"Hartford Accident & Indemnity Co.,

"Hartford, Connecticut.

"Gentlemen:

"There has been a shortage discovered in the accounts of J. T. Murphy, County Treasurer of Pope County, Arkansas, in the amount of $6,122.54. This is to inform you that the Bank of Dover is being held liable in this matter on account of the fact that there have been irregular activities in the County Treasurer's account as handled by Mr. Lemley, Cashier, and Mr. Murphy.

"Mr. G. S. Jernigan, State Bank Commissioner of Arkansas, has arranged a meeting with the Board of Directors of the Bank of Dover Friday morning, May 12th, to go into this matter. This is to advise you of this meeting that you may have a representative to see after your interests as they may appear in connection with Mr. Lemley's bond.

"Very truly yours,

"John E. Moore, President."

Hartford did not receive this letter in time to send a representative to the meeting referred to, but Caudle testified that prior to May 10th he notified Hartford's general agent for this state of this meeting and that one of the attorneys now representing Hartford did attend the meeting.

On May 13th, Hartford wired the president of the bank as follows: "Under no circumstances if you desire possibility benefit of bond admit any liability, to county as considerable question concerning bank's liability.

Matter has been referred to our attorney, John A. Sherrill, Little Rock, Arkansas, with instructions to make investigation immediately such investigation to be without prejudice to any of our rights liabilities and defense if any.''

The bank, following this direction, never at any time admitted liability and upon this issue adopted the allegations of the answer filed by Hartford in this suit.

Under date of July 11, 1939, the attorney for the sureties wrote the attorney for Hartford, in which letter the facts were recited as the bases of the claims of the sureties against Hartford being fully stated, and Hartford was advised that suit would be brought if the claim of the sureties to the right of subrogation was not satisfied. It appears that Hartford sent its representative to the Bank of Dover to investigate the claim of liability. This representative admitted that he was afforded every facility for his investigation and that he pursued it with the assistance of Lemley's successor as cashier. This representative also admitted that he was permitted by the banks of Russellville where Murphy's active accounts were kept, to make such investigation as he wished of Murphy's accounts with those banks. Hartford was thus fully advised of the nature of the claim against it before suit was filed and appears to have given this claim a number in the correspondence relating to it.

The facts stated dispose of Hartford's contention that no claim against it was filed before the institution of the suit, as the bond on which the suit is based required. It may be said, however, that compliance with this requirement was not made a condition precedent before filing suit. However, we think full and sufficient notice of this claim was given. Moreover, Hartford's denial of liability would have rendered the giving of notice unnecessary. *Equitable Surety Co.* v. *Bank of Hazen,* 121 Ark. 422, 181 S. W. 279; *Home Indemnity Co.* v. *Banfield Bros. Packing Co.,* 188 Ark. 683, 67 S. W. 2d 203.

It is insisted that Hartford cannot be held liable because Lemley, its principal, was not pursued and no judgment was recovered against him, and further that it had been agreed that the sureties would make no attempt to collect any judgment which might be rendered against the Bank of Dover. The existence of this agreement is denied. As a matter of fact, both Lemley and the bank were sued, and while no judgment was rendered against Lemley, a judgment was rendered against the bank and there was filed, after this appeal had been perfected, a stipulation as previously stated, that the bank had paid to the sureties the judgment rendered against it in their favor.

It is not shown why no judgment was rendered against Lemley, but whatever the reason may have been, this failure would not exonerate Hartford. Its bond did not require that this should be done and the suit on the bond could have been maintained even though Lemley had not been sued at all. Hartford did not ask that it have judgment against Lemley for any amount for which judgment might be rendered against it, and when and if the judgment against it is satisfied it may then assert its right against Lemley. No contention is made that the plaintiff sureties did anything which impaired this right.

In the case of *Hawkins* v. *Mims*, 36 Ark. 145, 38 Am. Rep. 30, it was said: ''Mere delay, then, or negligence on the part of the creditor to call upon or compel the principal debtor to pay gives the surety no defense. It is only acts which tend to prejudice him or to deprive him of the power of obtaining indemnity, which have that effect. Of course if the obligee releases any of his securities, or enters into a new contract with the principal, varying terms of the original agreement, or stays execution, after its levy on the property of the principal, whereby the lien is lost, or does any other act, the necessary effect of which is to discharge the principal from the debt or to lessen his responsibility, the non-assenting surety will be discharged, for such acts increase the surety's risk. (Citing cases.)''

It was there further said: ''The remedy of a surety, who is dissatisfied with the degree of activity displayed by the creditor in the pursuit of his principal, is to pay the debt himself. This subrogates him to all the rights and remedies of the creditor, and he can then manage the affair to suit himself.''

The theory of the plaintiffs' case is that they incurred a liability as sureties on Murphy's official bond, which resulted from and arose out of Lemley's infidelity to his trust as cashier of the Bank of Dover, against which infidelity the bank is insured by Hartford, and that they have the right by subrogation, having discharged this liability as sureties, to recover, not only from the bank, but also upon the fidelity bond which Hartford executed, having of course only one satisfaction.

The master found, and the court approved the finding, that this shortage as treasurer resulted from the misapplication of public funds in Murphy's custody, and that this application and misapplication resulted from Lemley's active participation in this conversion without which participation it would not have occurred. This opinion would be interminable if we were to discuss the manner in which the conversion of public funds occurred, but that it did occur is undisputed, and that it was done with Lemley's knowledge and participation is established by a preponderance of the evidence. For instance, Murphy received an official voucher from the State of Arkansas, payable to him as treasurer, in the sum of $2,186.52, and this warrant was placed to the credit of Murphy's personal account, the deposit slip having been signed by Lemley, the proceeds of which were credited to and used by Murphy in a manner which the auditor could not ascertain.

Now the law is that a bank has the right to presume, without making investigation, that the payee in a check, properly signed by the depositor, drawn against an account known to be trust fund, has the right to cash the check and convert the proceeds to his personal use, without liability therefor against the bank, unless the bank

knows, or is chargeable with knowledge, that the depositor has violated his trust in drawing the check, thereby participating in the wrongful conversion of the proceeds of the check. Here it is undisputed that Murphy deposited public funds to his personal account, and that he withdrew by check public funds for his private use, and we think the testimony shows that this was done with the knowledge and consent of Lemley.

In the case of *Drainage District No. 7 of Poinsett County* v. *Citizens Bank of Jonesboro,* 205 Ark. 435, 170 S. W. 2d 60, we quoted, with approval, the following statement from Chief Justice HART in the case of *Helena* v. *First National Bank,* 173 Ark. 197, 292 S. W. 140: ''The general principle governing the bank's liability is that the officers of the bank, who know that a fund on deposit is a trust fund, cannot appropriate that fund to the private benefit of the bank, or, where charged with notice of the conversion of the trustee, participate with him in appropriating it to his own use, without being liable to refund the money, if the appropriation is a breach of the trust. *Allen* v. *Puritan Trust Co.,* 211 Mass. 409, 97 N. E. 916, L. R. A. 1915C, 518, and *Blanton* v. *First National Bank of Forrest City,* 136 Ark. 441, 206 S. W. 745.''

It is urged that in the judgment rendered by the court below Hartford was not given credit for the payment made by Price above referred to. If it were not, it should be. The sureties did not make these payments, although they were made for their benefit, and they should not be given credit for payments which they did not make with their own funds. It appears, however, that twelve of the sureties on Murphy's bond paid each the sum of $183.33, and each was given judgment against the Bank of Dover for that amount, altogether totaling the sum of $2,199.99, with interest thereon from the date of their respective payments. This was the balance on account of the shortage which Price did not pay, so that the sureties have not been given credit for payments they did not personally make.

The stipulation hereinabove referred to is to the effect that the bank has now, by payment, satisfied these judgments against it in favor of the sureties. The bank was given judgment against Hartford for $2,199.99 in the decree, this being the net loss sustained through the peculations permitted and participated in by Lemley, so that this judgment would in fact allow credit for Price's payment, and Hartford will be required under the judgment to repay only what the sureties have personally paid. The judgment against Hartford requires that interest thereon be paid from March 2, 1943, this being the average date on which the sureties respectively made payments of which no complaint is made.

As thus interpreted we think the decree is correct and it is affirmed.